IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SUNLIGHT ELECTRICAL CONTRACTING :     CIVIL ACTION
CO., INC.                            :
                              :
      v.                    :
                              :
JOHN J. TURCHI, JR., et al.     :     NO. 08-5834

MEMORANDUM

Dalzell, J.                                  January 18, 2013

On May 30, 2008, Sunlight Electrical Contracting Co.,

Inc. ("Sunlight"), brought this case in the Court of Common Pleas

of Philadelphia County, Pennsylvania. Notice of Removal, Ex. B.

Sunlight, a construction subcontractor, sought $1,034,581.80 for

alleged non-payment of fees for construction services it provided

to the defendants.

The defendants removed to this Court, asserting federal

question jurisdiction on the basis of 28 U.S.C. § 1331 because

plaintiff's claims included a claim for civil RICO under 18

U.S.C. § 1964(c). Notice of Removal at 1. Sunlight invokes this

Court's supplemental jurisdiction over its state law claims

pursuant to 28 U.S.C. § 1367.

In January of 2009 defendants 23S23 and CHC LP filed a

third-party complaint against Hunter Roberts Construction Group,

Inc. alleging that to the extent 23S23 and CHC LP are liable to

Sunlight for nonpayment related to Sunlight's work on one of the construction projects, located in Philadelphia at 23 South 23rd Street, such liability arose out of the errors of Hunter Roberts, the construction manager for that project. Third Party Comp. ¶¶ 33-39. 23S23 and CHC LP thus sought indemnification from Hunter Roberts on those claims. Id. at ¶¶ 63-64.

Discovery in the case closed in September of 2011, and the parties filed a flurry of motions, including Sunlight's motion to amend its complaint.[1] On April 24, 2012, we granted Sunlight's motion to amend in part. Sunlight promptly filed an amended complaint in which it reduced the scope of the action. While Sunlight, in its original complaint, sought damages based on alleged nonpayment for work it performed at 23 South 23rd Street, 400-414 Walnut Street, 1930-34 Chestnut Street, and 1700 Walnut Street, its amended complaint seeks damages only for nonpayment on the 23 South 23rd Street project.

The complaint as amended seeks damages from John Turchi, Jr., Turchi, Inc., Carriage House Condominiums, L.P.

---

[1] It bears noting that on September 13, 2011, we granted in part defendants' motion for judgment on the pleadings as to certain state law claims. Sunlight Elec. Contracting Co. v. Turchi, No. 08-5834, 2011 WL 4086077 (E.D. Pa. Sept. 13, 2011).

("CHC LP"), Carriage House Condominiums, G.P., Inc. ("CHC GP"), and 23S23 Construction, Inc. ("23S23"). Sunlight asserts claims for breach of contract and violations of the Pennsylvania Contractor and Subcontractor Payment Act ("CASPA"), 73 Pa. Cons. Stat. Ann. §§ 501, et seq. against 23S23 (Count I), Am. Comp. ¶¶ 47-54; a claim for breach of contract/implied contract and CASPA violations against Turchi, Inc., CHC LP, and CHC GP for nonpayment of invoices (Count II), Am. Comp. ¶¶ 55-67; the same claims against CHC LP, CHCH GP, Turchi, Inc., and 23S23 for nonpayment of invoices and nonpayment of costs incurred after the end of the contractual period (Count III), Am. Comp. ¶¶ 68-76; claims of unjust enrichment against Turchi, Inc., CHC LP, and CHC GP for nonpayment of costs incurred when Sunlight customized two units at 23 South 23rd Street (Count IV), Am. Comp. ¶¶ 77-83; and claims against John Turchi, Jr. for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO") (Count VI), Am. Comp. ¶¶ 116-144. Sunlight also brings a claim of "Piercing the Corporate Veil; Alter Ego; Fraud" against John Turchi, Jr. (Count V), Am. Comp. ¶¶ 84-115, and asserts an alter ego theory against Turchi, Inc. in Counts II and III.

Before us now are two motions for summary judgment. Defendants John Turchi, Jr., Turchi, Inc., CHC LP, and CHC GP[2] ("defendants") move for partial summary judgment on Sunlight's amended complaint seeking judgment in their favor on the veil piercing claims at Counts II, III, and V, and on Sunlight's civil RICO claim at Count VI. Third-party defendant Hunter Roberts Construction Group, LLC ("Hunter Roberts") moves for summary judgment on the third-party complaint. We first consider the defendants' motion for summary judgment on the RICO claim because this claim constitutes the sole basis for our original jurisdiction.

---

[2] In its brief in opposition to defendants' motion for summary judgment, Sunlight notes that "Defendants' Motion was only filed on behalf of two of the five defendants, Turchi, Inc. ('Turchi, Inc.') and John J. Turchi, Jr. ('Turchi')." Pl. Br. in Opp. at 3. However, in its memorandum in support of the motion for summary judgment, defense counsel notes, "Counsel for the moving defendants do not represent 23S23 Construction in this action and cannot bring this motion on its behalf. All references to 'defendants' exclude 23S23." Defs. Mem. at 1, fn. 1. Though defense counsel, Spector Gadon & Rosen, P.C., represent all other defendants and implicitly move on their behalf here, the motion for partial summary judgment only concerns claims affecting Turchi and Turchi, Inc.

**I.    Defendants' Motion for Summary
        Judgment on Sunlight's RICO Claim**

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant

summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  A party opposing a motion for

summary judgment "must set forth specific facts showing that

there is a genuine issue for trial."  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986) (quoting Fed. R. Civ. P. 56(e)).

We will thus begin by reviewing the facts with regard to the RICO

claim in Sunlight's amended complaint.[3]

_____

[3] Defendants urge us to consider the factual averments
in Sunlight's original complaint as judicial admissions binding
on Sunlight.  It is well-settled that judicial admissions, or
factual assertions in a party's pleadings, are binding on the
party asserting them.  See, e.g., Glick v. White Motor Co., 458
F.2d 1287, 1291 (3d Cir. 1972).  But in the Third Circuit, as in
other circuits, when a party amends a pleading, as Sunlight has
done here, admissions contained in the superseded pleadings lose
their binding force.  See Giannone v. U.S. Steel Corp., 238 F.2d
544, 547 (3d Cir. 1956) ("superseded pleadings" are "pleadings
which do not amount to judicial admissions"); see also Schomburg
v. Dow Jones & Co., Inc., --- Fed. Appx. ---, No. 12-2415, 2012
WL 5503779, at *2 (3d Cir. Feb. 14, 2012) ("many courts,
including ours, have recognized that judicial admissions may be
withdrawn by amendment") (citing American Title Ins. Co. v.
Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1956) for the
proposition that "[f]actual assertions in pleadings . . ., unless
amended, are considered judicial admissions conclusively binding
on the party who made them").  When they have been superseded by

## A.   Factual Background

We rehearse the facts in detail so that we may apply

the scrutiny needed to determine whether the facts reveal the

requisite deceit to support Sunlight's civil RICO claim, or,

instead, whether they merely suggest a breach of contract.[4]

---

amendment, admissions in earlier pleadings may still have
evidentiary value, but they are no longer binding.  See, e.g.,
Bank One, Tex., N.A. v. Prudential Ins. Co. of Am., 939 F. Supp.
533, 541 (N.D. Tex. 1996).  Thus, though we may consider the
averments in the pleadings that Sunlight's amended complaint
superseded, those averments will not be binding on Sunlight.

[4] Sunlight refers to allegedly fraudulent statements
Turchi made and instances in which he used the United States
mails and wires between October 1998 and April 2004.  Sunlight
argues that these activities constitute a pattern of racketeering
activity in violation of RICO, see Am. Comp. ¶¶ 117-121, 137.
Because RICO has a four-year statute of limitations, accruing
when a plaintiff discovers or should discover the injury,
Sunlight cannot recover for injuries it allegedly suffered before
May 30, 2004.  See Agency Holding Corp. v. Malley-Duff & Assoc.,
483 U.S. 143, 156 (1987).  But, as we discuss below, under the
"separate accrual" rule the occurrence of a separate predicate
act within the limitations period allows Sunlight to bring claims
for injuries it allegedly suffered as a result of that separate
act.  Sunlight makes clear that its RICO claim seeks recovery
only for injuries incurred in connection with the 23 South 23rd
Street project, which took place between October, 2004 and
October, 2007.  See Pl. Resp. in Opp. at 51 ("Sunlight is not
trying to use the 23 South 23rd Street project as [] a bootstrap
[to recover for injuries caused by other earlier predicate acts
that took place outside the limitations period]; it is only
seeking the damages it incurred on the 23 South 23rd Street
project.").  Allegedly fraudulent conduct that occurred outside
the limitations period is thus relevant in establishing a pattern

Sunlight Electrical Contracting Co., Inc. is an electrical design and construction subcontractor. Am. Comp. ¶ 15. On February 25, 2004, Turchi incorporated 23S23, Inc., CHC LP, and CHC GP in Delaware. Am. Comp. ¶¶ 130-31; Ans. ¶ 86 (admitting that the entities were formed in Delaware on that date). CHC GP is the general partner of CHC LP. Ans. to Am. Comp. ¶ 8.

When Sunlight and the defendants began working together on the 23 South 23rd Street project, Sunlight had already worked on four projects for Turchi. In 1999 Sunlight began working on a Turchi development at 1700 Walnut Street. Def. Mem. at 18. In 2000, Sunlight worked on a project at 1600 Sansom Street. Michael DiSandro Dep., Pl. Br. in Opp. Ex. 56 at 51:18-22. In 2001, Sunlight began work on a project at 400 Walnut Street. Pl. Br. in Opp. at 36. In 2002, Sunlight began work on a project at 1930-34 Chestnut Street. Id. All of those projects were in Philadelphia.

For the project at 400 Walnut Street, Sunlight claims that in August of 2001 Turchi put forward "Walnut Construction"

of racketeering activity of which the timely separate predicate act is a part.

as the "owner" and caused Walnut Construction to enter a contract with Sunlight for Sunlight to perform electrical work at 400 Walnut Street. Pl. Br. in Opp. at 34. Sunlight avers that the owner was in fact 400 Walnut Associates, L.P. Am. Comp. ¶¶ 113-114. Walnut Construction did not have any assets of its own.[5] Turchi Dep. in In re: 23S23 Construction, Inc., No. 09-12652, Bankr. E.D. Pa., at 103:10-13, Pl. Br. in Opp, Ex. 58. Pursuant to that contract, Sunlight was to receive $827,000, Am. Comp. ¶ 113, and Sunlight claims that it is still owed $203,151.68 from that amount. Pl. Initial Disclosures, Pl. Br. in Opp., Ex. 57.

Sunlight avers that it entered into contracts with Affordable Fire Protection, Inc. and Walnut Construction to perform work on 1930-34 Chestnut Street, Am. Comp. ¶¶ 117, 121, and it claims it is owed $261,585.58 for that work. Dec. 17, 2007 Letter, Pl. Br. in Opp., Ex. 57.

---

[5] Sunlight alleges that Turchi used the United States mail to falsely represent to another subcontractor, Gory Contracting, that Walnut Construction was in bankruptcy in order to avoid paying Gory $183,947.20 pursuant to Turchi's contract with Gory. Am. Comp. ¶ 116. In its amended complaint and response to defendants' motion for summary judgment, Sunlight makes no such averments as to any similar misrepresentations Walnut Construction made to it.

Sunlight also claims that Turchi failed to pay it in full for its work at 1700 Walnut Street, for which Sunlight avers that it is owed $152,333.32. Pl. Br. in Opp., Ex. 57.

Six of the other subcontractors for those projects are currently suing defendants for nonpayment. Pl. Br. in Opp. at 33; Subcontractors' Complaints, Pl. Br. Ex. 6-N-6-S, Ex. 60.

Sunlight received full payment for its work on the 16th Street and Sansom Street projects. See DiSandro Dep., Pl. Br. in Opp. Ex. 56 at 48:18-23.

With regard to Turchi's statements about payment on the earlier projects, Sunlight claims that Turchi "never told Sunlight . . . he did not intend to pay them in full; to the contrary, Turchi always expressed his intention to pay them." Pl. Br. in Opp. at 35. In support of this proposition, Sunlight points to the deposition of Michael DiSandro, Sunlight's President. See Affidavit of Michael DiSandro, Pl. Br. in Opp., Ex. 9, ¶ 1. In DiSandro's deposition he testified that, "[Turchi] kept saying to me, 'I'm going to get you paid. I'm going to get you paid.' But, you know, it was never said [sic] definitely answered." DiSandro Dep., Pl. Br. in Opp. Ex. 56 at 44:6-9. DiSandro said he spoke with Turchi more than ten times

regarding the payment for 1700 Walnut Street, id. at 45:6-8, and DiSandro described Turchi's statements as follows: "He said, 'Don't worry about it. I'm going to pay you.' But, you know, specifically, he always said -- he always blamed somebody else, he didn't have any money, he was short, overrun on a job, he had to refinance, all different -- different aspects." Id. at 46:17-23, see also id. at 48:25-49:9 (describing similar representations).

Furthermore, with regard to Turchi's representations about payment for the 1700 Walnut Street project, DiSandro testified that Turchi told him "that he was trying to refinance on 1700 and he needed money to be able to take care of the old bills. And eventually, he did do that. Later on he send me check [sic], like, two, three years later for that particular job." Id. at 49:23-50:5.

With regard to 400 Walnut Street, DiSandro testified, "On 4th and Walnut in particular, he said he was going to try to sell the penthouse. As soon as he make the sale on it, he was going to pay me for it. But this stuff never come about." Id. at 78:20-24. At the end of 2003, Sunlight still believed Turchi

owed it money for 400 Walnut and 1700 Walnut, see id. at 80:17-18.

DiSandro testified that he told Turchi that he was hesitant to work on the 23 South 23rd Street project because of Turchi's failure to make full payment on projects he had worked on in the past.  DiSandro Aff., Pl. Br. in Opp. Ex. 9, ¶ 2.  DiSandro said that after he expressed this concern Turchi paid Sunlight $100,000 toward the balance due on 1700 Walnut Street, id. at ¶ 3.

On October 27, 2004, Sunlight provided a written proposal to Turchi, Inc. offering to work on the electrical design and construction for the renovation of 23 South 23rd Street for $1,782,400.  Turchi, Inc. accepted the proposal on November 5, 2004.  See November 5, 2004 Letter, Pl. Br. in Opp. Ex. 59.  On February 2, 2005, Sunlight entered into a written contract with 23S23 in which Sunlight agreed to perform electrical services for a guaranteed maximum price of $1,782,400. Design/Build Subcontract Agreement, Am. Comp. Ex. A ¶ 2(d). According to the first paragraph of the agreement, CHC LP, the owner, had engaged 23S23 to be the construction manager for this project.  Am. Comp. Ex. A ¶ 1.

At the time the parties entered into the contract, 23S23 had no assets, see, Pl. Br. in Opp. at 15; Aug. 24 2011 Turchi Dep., Pl. Br. Ex. 10 at 130:20-131:1.  From 2004 – 2007 23S23 had only "cash" as an asset, and its balance at the start of each year was never more than $100.  23S23 Construction, Inc. Balance Sheets, Pl. Br. in Opp. Ex. 11.  Between January 2005 and January 2007, Turchi caused CHC LP, 23S23, Inc., and Turchi, Inc. to wire funds from the construction lender among and between each other and to Turchi himself.  Pl. Br. in Opp. at 17-22; Pl. Br. Ex. 6-E-H; 12-15; 17-19, 39, 43.

The instant dispute arises from nonpayment for work on the 23 South 23rd Street project in four categories.  The first involves nonpayment of contractual fees, as established in the contract, and, according to Sunlight, through later "change orders."  The second stems from "time and material" work ("T & M Work"), or work which was not included in the contract's scope, but which Sunlight performed on a "time and material" basis.  The third category is costs Sunlight incurred through delayed completion of the project, and the fourth involves costs Sunlight incurred in customizing two units at 23 South 23rd Street.

Turning to the first category, from November of 2004 until October of 2007, Sunlight performed the work described in the contract. Am. Comp. ¶ 19. Sunlight submitted invoices for its work according to the following schedule: from November, 2004 through April, 2005, Sunlight submitted six invoices to Turchi, Inc. From May, 2005 through April, 2006, Sunlight submitted twelve invoices to CHC LP. From May, 2006 through May, 2007 Sunlight submitted seven invoices to Turchi, Inc. Am Comp. ¶¶ 20-24.

Sunlight alleges that the total amount due for the twenty-five invoices it submitted from November, 2004 through May, 2007 -- which included the original contractual amount and change orders -- comes to $2,054,834. Am. Comp. ¶ 50; Pl. Br. in Opp. at 32 n.22; Pl. Br. in Opp., Ex. 57 at 12. Sunlight alleges that it has been paid $1,801,212.85 to date. Am. Comp. ¶ 51; Pl. Br. in Opp. Ex. 57 at 12. Sunlight does not provide evidence in support of this contention other than a statement contained in its own Initial Disclosures. Defendants counter that as of March of 2007 they had paid Sunlight $1,884,388.81. See Def. Br. in Supp. of Mot. at 9 n.13. In support of their contention, defendants point to Exhibit 3 of their motion for summary

judgment, a "Check Register" belonging to CHC[6], see Def. Mem. at 9 n.13.  Based on its contention that it received only $1,801,212.85, Sunlight argues that it is still owed $253,620 under the contract.  Even according to defendants' account, if Sunlight is correct that the total contract amount had been raised to $2,054,834 through change orders, Am. Comp. ¶ 50, defendants would still owe Sunlight $170,445 under the contract.

Sunlight next contends that it is owed money for work it performed on a "time and material basis" in May of 2004 and August of 2007.  Am. Comp. ¶ 30.  Sunlight alleges that "[a]ll of the extra and additional work performed and completed by Sunlight on the Project was at the direction and with the knowledge and approval of one or more authorized representatives of 23S23, Inc., or Hunter Roberts, or Turchi, Inc., including Turchi, or CHC LP, or CHC GP."  Am. Comp. ¶ 26.  Sunlight submitted a total of twenty-seven invoices for this work: two to John Turchi, Jr., twenty to Turchi, Inc., and five to Hunter Roberts[7], including one

---

[6] We are not told to which CHC entity defendants refer.

[7] On May 23, 2005, Turchi engaged Hunter Roberts as the construction manager, see Third Party Comp. ¶ 16.  Turchi did not amend the written agreement between Sunlight and 23S23 to include Hunter Roberts.  Am. Comp. ¶ 135.

with a copy to 23S23.  Am. Comp. ¶ 33.  Sunlight refers to this

work as "T & M Work", and it makes contradictory assertions

regarding the payment it received for this aspect of the job.

Sunlight first asserts that "[t]o the extent Sunlight received

payment on the invoices for T&M Work, the payments were made by

CHC LP," Am. Comp. ¶ 34, but it later claims that it was never

paid anything for the T&M Work, for which it was owed $74,331.08.

Am. Comp. ¶¶ 70-72.

The contract provided that Sunlight was to complete the

work by November of 2005, but the project was not finished by

then, and so on November 7, 2005, CHC LP agreed to extend the

completion date to April of 2006 and increase the amount of the

contract by $52,468.65 for Sunlight's additional costs.  Am.

Comp. ¶¶ 36-38.  Ultimately, Sunlight did not complete the

project until October of 2007 and it incurred additional labor

costs of $41,367 between May 1, 2006 and October 2, 2007.  Am.

Comp. ¶¶ 40-41.  Sunlight has not received any payment for those

additional labor costs.  Am. Comp. ¶ 42.

Sunlight alleges, and defendants do not dispute, that

at the direction of "one or more authorized representatives of

Turchi, Inc., Hunter Roberts, and CHC LP and CHC GP," Am. Comp. ¶

78, it provided customization services for two units at 23 South 23rd Street -- Units 3C and 4L -- for which it has received no payment.  Am. Comp. ¶¶ 44-46.  Sunlight alleges that the total cost of these customizations was $4,387.00.  Pl. Initial Disclosures, Pl. Br. in Opp. Ex. 57 at 13.

Sunlight alleges that as of October, 2007, it was owed a total of $418,705.08 for work it had completed on Turchi's behalf, Am. Comp. ¶ 136, and on December 17, 2007, Turchi signed a letter as president of 23S23 Construction, Inc. stating that "delays and cost over-runs" had affected the completion of the renovation and the unit sales, and asserting that Hunter Roberts was liable to Sunlight.  Am. Comp. ¶ 138.  Dec. 17, 2007 Letter, Pl. Br. in Opp. Ex. 61.  According to Sunlight, when Turchi wrote the letter, he had transferred more than $2,000,000 of construction mortgage loan funds from 23S23, Inc. and CHC LP to Turchi, Inc. and then from Turchi, Inc. to himself and entities he owns and controls.  Pl. Br. in Opp. 21-23; Account Statements, Pl. Br. in Opp. Ex. 6-G., 6-I-J, 15, 17, and 19-43.

Defendants contend that the claim that Sunlight was owed $418,706 in October of 2007 is inconsistent with the claim Sunlight made in its original complaint that it had been paid

$1,866,761.  Def. Mem. at 7, 9 n.13.  Sunlight's admissions in

its original complaint do not bind it, and although Sunlight

alleges in its amended complaint that CHC LP has paid it

$1,801,212.85 toward the contract fees to date, Am. Comp. ¶ 51,

that averment does not state when CHC LP paid Sunlight and so it

is not necessarily inconsistent with Sunlight's contention that

it was owed a certain amount in October of 2007.  But in light of

the Check Register defendants introduce, if Sunlight had been

paid $1,884,389 in March of 2007 -- even accepting its highest

estimates for the amounts owed for the T & M Work, the labor

costs due to delay, and customization costs -- Sunlight would

only be owed $290,530.28.  Nevertheless, the precise amount

Sunlight was owed is not material to its claim that Turchi's

December 17, 2007 statement was misleading in explaining why

Sunlight had not been paid.

### B.    The Civil RICO Standard

Count VI of the Amended Complaint alleges violations of

RICO, 18 U.S.C. §§ 1961-1968.  Section 1964(c) affords a private

right of action for those injured by violations of § 1962.  The

complaint does not specify which provision of § 1962 Sunlight

alleges Turchi violated.  In its RICO Case Statement, Sunlight

represented that Turchi violated §§ 1962(a), (b), (c), and (d).

Case Stmt. ¶ 1.  However, in its Brief in Opposition to the

defendants' motion, Sunlight now says that it brings its claim to

vindicate a violation of § 1962(c) only.  Pl. Br. in Opp. at 44.

Sunlight cannot, nor does it attempt to, demonstrate that it

suffered an investment injury sufficient to sustain a claim under

§ 1962(a), see, e.g., Brittingham v. Mobil Corp., 943 F.2d 297,

303 (3d Cir. 1991) (a claim under section 1962(a) "requires that

a plaintiff's injury be caused by the use or investment of income

in [an] enterprise"), nor does it attempt to make a claim under

§§ 1962(b) or (d).  We will therefore accept the argument

Sunlight advances in its opposition to the motion for summary

judgment,[8] and we will construe Sunlight's Amended Complaint as

making a claim under 18 U.S.C. § 1962(c).

---

[8] As we discuss above, to the extent Sunlight's Amended
Complaint contradicts its earlier pleadings, these superseded
pleadings are not binding judicial admissions.  Furthermore,
judicial admissions are always limited to statements of fact and
do not include "statement[s] of [counsel's] conception of the
legal theory of a case," Glick, 458 F.2d at 1291.  A statement
regarding which provision of § 1962 defendants violated would
unquestionably constitute a statement of legal theory.

Section 1962(c) proscribes "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, [from] conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  In order to state a claim under § 1962(c), the plaintiff  who suffers RICO injury to his business or property must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Lum v. Bank of America, 361 F.3d 217, 223 (3d Cir. 2004) (citing Sedima, S P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)).

### a.    **"Enterprise" Allegations**

In order to sustain a claim under § 1962(c), a plaintiff must allege activity by both a person and an enterprise.  See, e.g., Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc., 46 F.3d 258, 262 (3d Cir. 1995).

Sunlight alleges that the "enterprise" in question is each of the corporate defendants -- Turchi, Inc., CHC LP, CHC GP, and 23S23 -- individually and collectively.  Am. Comp. ¶ 110.

In determining whether a plaintiff has adequately alleged activity by both a person and an enterprise, our Court of Appeals applies a distinctiveness requirement whereby "the 'person' subject to liability cannot be the same entity as the 'enterprise.'" Jaguar Cars, 46 F.3d at 262 (quoting Hirsch v. Enright Refining Co., 751 F.2d 628, 633 (3d Cir. 1984)).

Our Court of Appeals has interpreted this distinctiveness requirement as meaning that although "a claim simply against one corporation as both 'person' and 'enterprise' is not sufficient," a complaint "alleging conduct by officers or employees who operate or manage a corporate enterprise satisfies this requirement." Id., at 268. Moreover, in Jaguar Cars the Court quoted Judge Posner with approval on this point, particularly his assessment that it "[t]he only important thing is that [the enterprise] be either formally (as when there is incorporation) or practically (as when there are other people besides the proprietor working in the organization) separable from the individual." Id. at 269 (quoting McCullough v. Suter, 757 F.2d 142, 144 (7th Cir. 1985).

Though Sunlight argues in its opposition to the summary judgment motion that "the enterprise consisted of Turchi, Turchi,

Inc., CHC LP, CHC GP, 23S23, Inc., Walnut Construction, 1930-34 Associates, L.P. and 1700 Associates, L.P.," Pl. Br. in Opp. at 32, the amended complaint is more precise: "[e]ach of the corporations and partnerships named in this civil action constitutes an 'enterprise' within the meaning of 18 U.S.C. § 1962, and the corporations and partnerships, as dominated, controlled and operated by Turchi for his personal benefit, collectively constitute an 'enterprise' within the meaning of 18 U.S.C. § 1962." Am. Comp. at second ¶ 110 on pg. 23.

Defendants do not challenge the sufficiency of Sunlight's "enterprise" allegations, and we accept Sunlight's description that the enterprise consists of legally incorporated corporations through which Turchi conducted business. The civil RICO claim does not fail on this ground.

### b. **Mail And Wire Fraud**

The statute defines "racketeering activity" as any act which is indictable under a set of federal and state statutes, including 18 U.S.C. § 1341 (regarding mail fraud) and 18 U.S.C. § 1343 (regarding wire fraud). A "pattern of racketeering activity" requires proof that the defendant has committed at

least two acts of racketeering within a ten-year period. §
1961(5).  See also, e.g., Rotella v. Wood, 528 U.S. 549, 552
(2000).

Here, Sunlight alleges that John Turchi engaged in a
pattern of racketeering activity consisting of mail fraud and
wire fraud.  Am. Comp. ¶ 141.  The elements of an offense under
RICO are identical whether the case is civil or criminal, see,
e.g., Eisenberg v. Gagnon, 564 F. Supp. 1347, 1353 (E.D. Pa.
1983).  The elements of mail fraud and wire fraud are: "(1) the
existence of a scheme to defraud; (2) the participation by the
defendant in the particular scheme with the specific intent to
defraud; and (3) the use of the United States mail or of wire
communications in furtherance of the fraudulent scheme", United
States v. Syme, 276 F.3d 131, 142 n.3 (3d Cir. 2002) (see also
Walter v. Palisades Collection, LLC, 480 F. Supp. 2d 797, 803 (3d
Cir. 2007) (applying the Syme standard)).

The offense requires proof of specific intent, United
States v. Pearlstein, 576 F.2d 531, 535 (3d Cir. 1978), and this
"may be found from a material misstatement of fact made with
reckless disregard for the truth", United States v. Hannigan, 27
F.3d 890, 892 n.1 (3d Cir. 1994).  The scheme "must involve some

sort of fraudulent misrepresentations or omissions reasonably
calculated to deceive persons of ordinary prudence and
comprehension." United States v. Pearlstein, 576 F.2d 531, 535
(3d Cir. 1978), see also Palisades, 480 F. Supp. 2d at 803. As
the Supreme Court has explained, "The words 'to defraud' in the
mail fraud statute have the common understanding of wronging one
in his property rights by dishonest methods or schemes, and
usually signify the deprivation of something of value by trick,
deceit, chicane or overreaching." Carpenter v. United States,
484 U.S. 19, 27 (1987)(internal quotations omitted).

Finally, the use of the mail or wires need not be
essential to the scheme, Schmuck v. United States, 489 U.S. 705,
710 (1989). Instead, that use may be merely incident to an
essential part of the scheme. Id.

The Supreme Court has held that "RICO is to be read
broadly," Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497
(1985). But our Court of Appeals has cautioned that because of
the "relative ease with which a plaintiff may mold a RICO pattern
from allegations that, upon closer scrutiny, do not support it,"
Kolar v. Preferred Real Estate Investments, Inc., 361 F. App'x

354, 363 (3d Cir. 2010)(internal quotations omitted), we must carefully scrutinize RICO claims.  Id.

The essence of Sunlight's mail and wire fraud allegation is that Turchi engaged in a scheme to defraud subcontractors by inducing them to perform work for which he never intended to pay them in full.  Pl. Br. in Opp. at 33. Sunlight alleges that Turchi used the United States mail and wires through the "transmittal of checks in partial payment for work performed, the transmittal of written communications requesting payments and denying payments for work performed and completed, and numerous wire transfers of construction mortgage funds from 23S23, Inc. and CHC LP into and out of Turchi, Inc." in order to further "his fraudulent scheme to obtain goods, labor, material, work and services for construction of the 23rd Street Project without paying therefor", Am. Comp. ¶ 141.

### c.    The RICO Statute of Limitations

As a threshold matter, Turchi contends that the statute of limitations bars Sunlight's RICO claim.  As noted, civil RICO claims have a four-year limitations period, Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143, 152-56 (1987).

That period begins to run from the date the plaintiff knew or should have known of the injury.  Rotella v. Wood, 528 U.S. 549, 558 (2000) (rejecting the "injury and pattern discovery rule" and holding that the statute of limitations for civil RICO claims accrues at "the point of injury or its reasonable discovery").

Turchi argues that Sunlight first suffered injury from the alleged scheme to defraud on March 2, 2000 when Sunlight was working with Turchi on an earlier project (1700 Walnut), and the payment on Sunlight's "final Application for Payment" on that project became overdue.  Def. Mem. at 18.

Sunlight responds that it only seeks to recover damages for alleged RICO violations connected with the 23 South 23rd Street project.  Pl. Br. in Opp. at 50.  Sunlight completed its work on that project in October of 2007, and so it contends that its nonpayment injury occurred then -- well within the four-year statute of limitations preceding its May 30, 2008 filing in state court.  Id.  Sunlight also argues that the pattern of racketeering began during earlier projects for which Sunlight provided subcontracting services to Turchi and continued through the 23 South 23rd Street project -- including the act of sending the allegedly fraudulent December 17, 2007 letter.  Am. Comp. ¶

142. Sunlight urges us to adopt the "separate accrual" rule according to which "the commission of a separable, new predicate act within a 4-year limitations period permits a plaintiff to recover for the additional damages caused by that act." <u>Klehr v. A.O. Smith Corp.</u>, 521 U.S. 179, 190 (1997).[9]

---

[9] In <u>Klehr</u>, the relevant distinction between the separate accrual rule and the "last predicate act" rule, which the Court rejected, is that under the "last predicate act" rule a plaintiff could recover not only for the harm caused by predicate acts committed within the limitations period, but for "all the harm caused [plaintiff] by all the acts that make up the total 'pattern.'" <u>Klehr</u>, 521 U.S. at 187. The Supreme Court explained that, because of this distinction, applying the separate accrual rule in <u>Klehr</u> would not help plaintiffs because "they ha[d] not shown how any new act could have caused them harm over and above the harm that the earlier acts caused." <u>Id.</u> at 190.

Here, the separate accrual rule would save plaintiff's RICO claim because Sunlight can demonstrate a new non-payment injury resulting from defendants' acts during the renovation of 23 South 23rd Street.

We note also that in <u>Bankers Trust Co. v. Rhoades</u>, 859 F.2d 1096, 1105 (2d Cir. 1988), which the Supreme Court cited in explaining the separate accrual rule in <u>Klehr</u>, the Second Circuit found that the RICO statute accrues each time a plaintiff discovers, or should have discovered, a new <u>injury</u> rather than accruing upon "the commission of a separable, new predicate <u>act</u>", <u>Klehr</u>, 521 U.S. at 190 (emphasis added). The distinction between these approaches carries no dispositive weight here as Sunlight alleges both an additional predicate act -- the December 17, 2007 letter -- and an additional injury -- the October 2007 nonpayment -- within the limitations period. Nevertheless, our analysis will of course adhere to the Supreme Court's formulation in which the limitations period accrues upon the occurrence of a separate predicate act within the four-year limitations period for the

The Supreme Court in <u>Klehr</u> appears to have accepted the validity of the separate accrual rule, and we find no evidence that it barred the use of the rule in <u>Rotella</u>. We will therefore apply the separate accrual rule, under which Sunlight's RICO claim for the injuries it allegedly suffered relating to the project at 23 South 23rd Street are not time-barred.

### C.    **Civil RICO Compared With Breach of Contract Actions**

Courts have distinguished breach of contract claims from civil RICO claims based on mail and wire fraud because unlike breach of contract actions, mail and wire fraud claims require that the defendant has acted in a deceitful manner. Though the scheme to defraud "need not be fraudulent on its face, [it] must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." <u>United States v. Pearlstein</u>, 576 F.2d 531, 535 (3d Cir. 1978)(internal quotations omitted); <u>see also, e.g.</u>, <u>Kehr Packages, Inc. v. Fidelcor, Inc.</u>, 926 F.2d 1406, 1415 (3d Cir. 1991).

---

limited purpose of allowing a plaintiff to bring claims
vindicating new injuries caused by that act.

We must therefore determine whether Turchi's behavior involved "fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension" or whether the allegations constitute only a breach of contract action.

Our Court of Appeals has clarified that a scheme to defraud need not include an explicit false representation, see, e.g., United States v. Frankel, 721 F.2d 917, 921 (3d Cir. 1983). But while "[t]he scheme need not involve affirmative misrepresentation, [] the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicane or overreaching.'" Kehr, 926 F.2d at 1415 (quoting McNally v. United States, 483 U.S. 350, 358 (1987)).

Courts have repeatedly found the element of deceit missing in breach of contract claims.  For example, in Kolar as here the plaintiff claimed that defendants had diverted money they owed him to other defendant-controlled entities.  Our Court of Appeals affirmed the district court's dismissal of the RICO claims, finding that "[t]hese allegations set forth disputes sounding in contract.  Kolar cannot successfully transmute them into RICO claims by simply appending the terms 'false' and

'fraudulent.'" Kolar, 361 F. App'x at 363.  Sunlight here makes

the cognate allegation against Turchi, i.e., that he transferred

money to entities he controlled so as to avoid payment.

Indeed, our Court of Appeals has long acknowledged the

distinction between breaches of contract and mail and wire fraud

that would give rise to a civil RICO action.  In Annulli v.

Panikkar, 200 F.3d 189, 199-200 (3d Cir. 1999), the Court

explained that "theft by deception, like a simple breach of

contract or intentional interference with contract, is not a

predicate act of racketeering activity enumerated in § 1961(1) .

. . We will not read language into § 1961 to federalize every

state tort, contract, and criminal law action."

Our Court of Appeals in Annulli also explained its

reasoning for distinguishing civil RICO claims from common law

contract claims:

> First, RICO's list of acts constituting
> predicate acts of racketeering activity is
> exhaustive.  To read it otherwise would be
> to usurp the role of Congress in drafting
> statutes.  Second, if garden-variety state
> law crimes, torts, and contract breaches
> were to constitute predicate acts of
> racketeering (along with mail and wire
> fraud), civil RICO law, which is already a
> behemoth, would swallow state civil and
> criminal law whole.  Virtually every

> litigant would have the incentive to file
> their breach of contract and tort claims
> under the federal civil RICO Act, as treble
> damages and attorney's fees would be in
> sight. We will not read language into §
> 1961 to federalize every state tort,
> contract, and criminal law action.

Id., at 200 (internal citations omitted). Other courts have

reached similar conclusions. See, e.g., United States v.

Kreimer, 609 F.2d 126, 128 (5th Cir. 1980) ("the statute does not

reject all business practices that do not fulfill expectations,

nor does it taint every breach of a business contract");

Gagliardi v. Ward, 967 F. Supp. 67, 68-69 (N.D.N.Y. 1997)

(nonpayment under a contract does not give rise to a RICO claim);

Fuce v. West, No. 12-0874, 2012 WL 3046235, at *3 (E.D. Pa. July

26, 2012) (finding that "[d]espite [plaintiff]'s efforts to

transform [defendant]'s conduct into criminal offenses, it is

clear that he alleges a breach of contract cause of action",

where plaintiff alleged that defendant had paid him less than he

had agreed to in an employment contract).

Here, the essence of Sunlight's allegation is that

Turchi repeatedly failed to pay it the money it was owed

according to their contracts. As such, Sunlight presents a

garden variety breach of contract claim between a developer and

contractor.  Defendants' actions do not involve the deceit

crucial to be the stuff of a civil RICO claim.

First, Sunlight suggests that it was deceptive of

Turchi to enter into contracts with Sunlight and other sub-

contractors through no-asset, single-purpose, entities.  Pl. Br.

in Opp. at 47.  Sunlight argues that

> [B]etween 2001 and 2005, Turchi used
> entities with no assets to enter into
> contracts with contractors on the 400
> Walnut, 1930-34 Chestnut and 23 South 23rd
> Street projects, and then prevented those
> entities from obtaining the construction
> funds borrowed from the lenders . . . He
> would then use the contracting entities as
> 'shields' that he hid behind claiming they
> had no money . . . .

Id.  But such a practice could only deceive Sunlight if Sunlight

believed those entities were, in fact, separate from Turchi --

that they were funded and controlled through some other

undisclosed source.  Instead, as the testimony of Sunlight's

President make pellucid, Sunlight well knew that Turchi was the

principal behind all the contracts Sunlight entered into for its

projects with him.  See, e.g., Michael DiSandro Dep., Pl. Br. in

Opp. Ex. 56, at 49:18-25 (explaining that he worked for Turchi on

projects at 1700 Walnut Street, 1600 Sansom Street, and 400

31

Walnut Street); DiSandro Aff., Pl. Br. in Opp. Ex. 9, ¶¶ 2-5
(admitting that Sunlight signed the contract for the 23 South
23rd Street project precisely because Turchi had made a payment
toward the 1700 Walnut Street debt).

Moreover, the theory that Turchi deceived Sunlight by
making payments on earlier projects to induce Sunlight to work on
the 23 South 23rd Street projects only makes sense if Sunlight
<u>knew</u> that Turchi was behind 23S23 -- the single-purpose entity
with which it contracted for that project.  If Sunlight believed
Turchi was unconnected to 23S23, Turchi's payment would offer no
comfort as to 23S23's ability to pay.

This second theory of deception -- that Turchi promised
to pay and made partial payments on earlier projects to induce
Sunlight to continue working with him -- must also fail.

Defendants argue that "[t]he idea that commercial
construction subcontractors unwittingly fell victim to a scheme
of serial contract breaches whereby they entered into new
contracts with their perpetrator, time and time again, over a
decade-long period, is inconsistent with reasonable reliance on
misrepresentations."  Def. Mem. at 25.  We agree.  Courts have
rejected the argument that behavior such as Turchi's can give

rise to a claim under RICO, reasoning that if a plaintiff-company continues to transact business with someone who has broken contracts in the past, then that plaintiff is not acting as a person of ordinary prudence and comprehension. Such a plaintiff therefore cannot allege the requisite deceit needed to sustain a claim of mail and wire fraud. See, e.g., Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 747 (3d Cir. 1996) (finding no mail or wire fraud where the plaintiff, early in its contractual relationship with the defendant, knew the defendant was charging higher prices than the contract allowed); Lubart v. Riley & Fanelli, P.C., No. 97-6392, 1998 WL 398253, at *6 (E.D. Pa. June 22, 1998) ("A person of ordinary prudence and comprehension would not contract with a party who the person believed had fraudulently breached a contract between the parties in the past").

Sunlight's claims are thus in the heartland of contract law. No genuine dispute of material fact exists as to whether Turchi deceived Sunlight, as would be necessary to sustain a civil RICO claim. We will therefore grant summary judgment to defendants with regard to Count VI of the Amended Complaint.

## II.  **Remaining State Law Claims and Third-Party Claims**

28 U.S.C. § 1367(c)(3) provides that a district court may decline to exercise supplemental jurisdiction over state law claims if it has "dismissed all claims over which it has original jurisdiction".  Our original jurisdiction here is founded solely upon Sunlight's civil RICO claim against John J. Turchi, Jr., and so we no longer have original jurisdiction over the action.  Of the six other suits pending by subcontractors against defendants, four are proceeding in the Philadelphia County Court of Common Pleas, one in the Lehigh County Court of Common Pleas and one in Bankruptcy Court.  Pl. Br. in Opp. at 33.  These cases will likely raise state law questions similar to those at issue in this action.  Principles of judicial economy, convenience, and comity thus counsel in favor of dismissal without prejudice of the remaining state law claims.

BY THE COURT:


/S/ STEWART DALZELL, J.